# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2367

_____

United States of America,

        Appellee,

v.

John H. Sitting Bear,

        Appellant.

_____

No. 05-2368

_____

United States of America,

        Appellee,

v.

Melinda L. Marshall,

        Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Appeals from the United States
District Court for the
District of South Dakota.

_____

Submitted: January 11, 2006
Filed: February 7, 2006

_____

Before MURPHY, HANSEN, and SMITH, Circuit Judges.

_____

HANSEN, Circuit Judge.

John H. Sitting Bear pleaded guilty to committing second degree murder in Indian country, 18 U.S.C. §§ 1153 and 1111, and Melinda L. Marshall pleaded guilty to aiding and abetting second degree murder in Indian country, 18 U.S.C. §§ 1153, 1111, and 2, following the tragic death of their four-year-old son, John, Jr. The district court[1] sentenced each of them to 228 months (19 years) of imprisonment, from which they both appeal. We affirm as to each defendant.

## I. Background

Sitting Bear and Marshall were the parents of four-year-old John, Jr., who died following a period of abuse by Sitting Bear and Marshall. Marshall's sister raised John, Jr. from the time of his birth until he was almost four years old while Marshall was serving time in federal prison for assault with a deadly weapon. Marshall and Sitting Bear fought for and won custody of John, Jr. around Christmas 2002. He died less than six months later on June 19, 2003.

Marshall and Sitting Bear each accused the other of various forms of abuse against John, Jr. prior to his death. The evidence revealed that John, Jr. was toilet trained when he was returned to his parents. Following his return to their custody, Marshall got upset when John, Jr. made messes in his pants, and she often withheld food from him so that she would not have to clean up after him. In the six months in which John, Jr. was under Marshall's and Sitting Bear's care, he lost 19 pounds, weighing only 30 pounds at the time of his death. Marshall also spanked John, Jr.

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

with the metal handle of a fly swatter on his back, legs, and buttocks. According to Sitting Bear, these beatings were nearly daily. Sitting Bear was a forest firefighter and was away from home for stretches at a time. Although he left the primary discipline to Marshall, Marshall claimed that Sitting Bear frequently spanked John, Jr. with a fly swatter, belt, or curtain rod as well.

Both defendants claimed that the other beat John, Jr. on the evening of June 17. It is undisputed, however, that on June 18, Sitting Bear woke John, Jr. early in the morning as Sitting Bear was getting ready for a firefighter training class and sent John, Jr. out to the outhouse to use the bathroom. Unsatisfied with John, Jr.'s slow pace, Sitting Bear shoved John, Jr. out the door, causing John, Jr. to fall on the cement. John, Jr. was still moving slowly when he returned to the house, so Sitting Bear shoved him again, this time pushing him into a wall. Sitting Bear then picked him up and swung him around by his arm, swinging his head into a table. John, Jr. was unresponsive following the blow to his head. Sitting Bear and Marshall took John, Jr. to the Rosebud hospital, and he was transported by air ambulance to Rapid City Regional Hospital where he died the following day. Both were charged with first degree murder and aiding and abetting first degree murder. Sitting Bear ultimately pleaded guilty, without the benefit of a written plea agreement, to second degree murder, and Marshall pleaded guilty, pursuant to a written plea agreement, to aiding and abetting second degree murder.

At the joint sentencing hearing held in May 2005, Sitting Bear and Marshall continued to blame the other for various abuses to John, Jr., although Sitting Bear admitted to his actions on June 18 that led to John, Jr.'s death. The district court assessed a two-level enhancement to Sitting Bear's base offense level for obstruction of justice based on Sitting Bear's interviews with the FBI investigators. The court also granted Sitting Bear a three-level reduction for acceptance of responsibility, resulting in a sentencing range of 151 to 188 months. The court determined that upward departures no longer exist after United States v. Booker, 543 U.S. 220 (2005), and,

applying the sentencing factors contained in 18 U.S.C. § 3553(a), sentenced Sitting Bear to a non-Guidelines sentence of 228 months of imprisonment. The district court determined Marshall's sentencing range to be 151 to 188 months, based in part on a criminal history category III. Marshall had a prior felony conviction for assault with a deadly weapon and was on supervised release from that conviction at the time of the instant offense. Although not included in her criminal history score, Marshall also had a prior child neglect conviction in tribal court (involving a different child) and several child abuse arrests over the previous several years. The court likewise sentenced Marshall to 228 months in prison, noting the irony of the fact that while Marshall had committed most of the abuse over the prior six months in which she and Sitting Bear had custody of John, Jr., it was Sitting Bear's actions that led to his ultimate death. The court found them equally culpable in John, Jr.'s death.

Sitting Bear appeals his sentence, arguing that the district court erred in assessing the two-level enhancement for obstruction of justice, erred in sentencing him above the sentencing range without giving notice under Federal Rule of Criminal Procedure 32(h), and violated his right to due process by sentencing him above the advisory Guidelines range without considering the departure factors contained in the United States Sentencing Guidelines, resulting in an unreasonable sentence. Marshall appeals her sentence, arguing that it is an unreasonable sentence in light of the § 3553(a) sentencing factors.

Sitting Bear's Sentence

A. Rule 32(h) Notice

Sitting Bear's sentence above the advisory Guidelines range was not based on an upward departure for which he was entitled to notice under Rule 32(h).[2] Rather,

---

[2]"Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating

it was a non-Guidelines sentence, a variance if you will, based upon the district court's review of the case and Sitting Bear's history in light of all of the § 3553(a) sentencing factors. Sitting Bear's claim to Rule 32(h) notice lacks merit under our circuit precedent, see United States v. Long Soldier, 431 F.3d 1120, 1122 (8th Cir. 2005) ("[N]otice pursuant to Rule 32(h) is not required when the adjustment to the sentence is effected by a variance, rather than by a departure."); United States v. Egenberger, 424 F.3d 803, 805 (8th Cir. 2005) (same), cert. denied, 2006 WL 37949, 74 U.S.L.W. 3393 (U.S. Jan. 9, 2006), and the district court did not err in failing to give Sitting Bear any Rule 32(h) notice.

> B.    USSG § 3C1.1 Obstruction of Justice Enhancement

Sitting Bear argues that his interviews with the investigators did not amount to an obstruction of justice warranting a two-level enhancement under U. S. Sentencing Guidelines Manual (USSG) § 3C1.1 (2003). We review the district court's factual findings used to support an obstruction of justice enhancement for clear error, but we apply a de novo review to the application of the enhancement to the facts found by the district court. United States v. Vinton, 429 F.3d 811, 818 (8th Cir. 2005).

The obstruction of justice enhancement applies if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation . . . of the instant offense of conviction." USSG § 3C1.1. One example of behavior that triggers the enhancement is when a defendant "provid[es] a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation . . . of the instant offense."Id. § 3C1.1, comment. (n.4(g)). "Material" is defined as "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." Id., comment. (n.6).

---

such a departure. The notice must specify any ground on which the court is contemplating a departure." Fed. R. Crim. P. 32(h).

Sitting Bear met with investigators several times beginning on June 18, the day John, Jr. went into a coma and was hospitalized. Sitting Bear originally told FBI agents on that date that John, Jr.'s injuries resulted from him falling off of the hood of a parked car a few days prior to going into the coma. Sitting Bear denied ever hitting John, Jr. Sitting Bear met with the agents two days later on June 20, after John, Jr. had died, and added to his story that John, Jr. had fallen off of his bike a week prior to entering the coma, had been knocked down by a dog, and had recently fallen from a jungle gym. At this time Sitting Bear admitted to pushing John, Jr. out of the door the morning that he went into the coma, causing him to hit his head on the cement porch, but he continued to deny any further involvement.

Sitting Bear and Marshall were both indicted on first degree murder charges in August 2003. During an interview in February 2004, Sitting Bear told investigators that Marshall had hit John, Jr. on the evening of June 17, knocking his head into a door frame. It was not until an interview on April 7, 2004, nearly ten months after John, Jr.'s death, that Sitting Bear told investigators about swinging John, Jr.'s head into the table.

The district court found that Sitting Bear lied on June 18 when he told the investigators that John, Jr.'s injuries resulted from falling off of a parked car three days earlier and when he denied hitting John, Jr. Sitting Bear's argument that the other events that might have caused John, Jr.'s injuries actually happened, and therefore he did not lie, misses the point. He may not have lied about the other accidents occurring, but he certainly misled the investigators about the cause of John, Jr.'s injuries that put him into a coma. We further reject Sitting Bear's brazen attempt to construe his statement that he did not hit John, Jr. as technically truthful. Sitting Bear's denial that he hit John, Jr., knowing full well that he had shoved John, Jr. into a wall and swung his head into a table immediately prior to John, Jr. losing consciousness, was a blatant lie in an attempt to place the blame for his son's injuries

elsewhere. The district court's conclusion that Sitting Bear lied to the investigators is not clearly erroneous.

Lying to investigators in and of itself does not support a § 3C1.1 enhancement for obstructing justice. The false statements must have been material to the investigation. Further, general denials of guilt that are not made under oath do not support an obstruction enhancement. See United States v. Yankton, 986 F.2d 1225, 1228 (8th Cir. 1993) (holding that a statement to tribal officers that "I did not rape . . . my niece" was a general denial which would not support an obstruction enhancement). But Sitting Bear did more than deny his guilt. He misled the investigators with stories unrelated to his own actions in an attempt to divert the investigators from focusing their attention on him, and he denied his own involvement. The misleading stories and denial of any involvement were certainly material to the investigation into the cause of John, Jr.'s injuries.

We also agree with the district court that Sitting Bear's misleading statements impeded the investigation. One of the investigators testified that Sitting Bear's admission in April 2004 that he swung John, Jr. into the kitchen table "was a significant step forward in the investigation." (Nov. 29, 2004, Sent. Tr. at 52.) Prior to that time, the investigators were focused on both parents as the cause of John, Jr.'s death, but the investigators had no basis for determining which of the two was responsible for the ultimate act that sent John, Jr. into a coma and caused his death. In February 2004, Sitting Bear implicated Marshall by telling the investigators that Marshall had knocked John, Jr. into a door frame the night before he went into the coma, but Sitting Bear continued to withhold the extent of his own actions on the morning of June 18. Although Sitting Bear had no obligation to tell investigators anything, once he chose to talk, he had an obligation to be truthful. Sitting Bear's exculpatory explanations and attempts to point the finger at his codefendant without providing the full picture of his own actions support the district court's application of

the obstruction of justice enhancement. See United States v. Baker, 200 F.3d 558, 562 (8th Cir. 2000) (holding that statements to the investigator that provided an exculpatory version of events and caused the investigator to conduct further analysis of financial transactions was more than a mere denial of guilt and supported an obstruction enhancement).

          C.      The Reasonableness of Sitting Bear's Sentence

At sentencing, the district court stated that following Booker, "[t]here's no such thing as an upward departure." (May 9, 2005, Sent. Tr. at 72; see also id. at 68, 71.) We agree with Sitting Bear that the district court clearly erred in so concluding. As we explained in United States v. Haack, 403 F.3d 997, 1002-03 (8th Cir.), cert. denied, 126 S. Ct. 276 (2005), post-Booker, there are essentially three steps to determining an appropriate sentence. First, the district court should determine the applicable Sentencing Guidelines range without consideration of any Guidelines departure factors, because the Guidelines remain an important sentencing factor. See § 3553(a)(4). Second, the district court, where appropriate, should consider the departure provisions contained in Chapter 5, Part K and/or § 4A1.3 of the Guidelines, as those sentencing provisions have not been excised by Booker. The resulting range is the post-Booker advisory Guidelines range. Third, the district court should consider the rest of the § 3553(a) factors in determining whether to impose the "Guidelines sentence" as determined in the prior steps or a "non-Guidelines sentence" driven by the other § 3553(a) considerations, and sentence the defendant accordingly. Haack, 403 F.3d at 1003; see also United States v. Denton, No. 05-1978, 2006 WL 162980, at *7 (8th Cir. Jan. 24, 2006) (reviewing the sentence imposed by the district court under the three-part Haack methodology). "When a court of appeals reviews a district court's sentencing determination for reasonableness, the correct [G]uidelines range is still the critical starting point for the imposition of a sentence." United States v. Hawk

<u>Wing</u>, No. 05-2263, 2006 WL 27681, at *7 (8th Cir. Jan. 6, 2006) (internal marks omitted).

Sitting Bear argues that the district court's failure to consider an upward departure under the <u>Haack</u> analysis deprived him of due process because it allowed the district court to circumvent the assessment of justifying factors contained in the departure Guidelines. Although the district court erred, the error was harmless. As we recently noted in rejecting a similar argument in <u>Long Soldier</u>:

> The district court's erroneous belief that it could not depart upward did not deprive [Sitting Bear] of any substantial-or even beneficial-right. He was deprived merely of the opportunity to receive an upward departure and, perhaps, a longer sentence. As such, any error is harmless pursuant to Fed. R. Crim. P. 52(a).

431 F.3d at 1122. Further, there can be no due process violation without a showing of undue harshness, <u>see</u> <u>United States v. Wade</u>, No. 05-2181, 2006 WL 73474, at *2 (8th Cir. Jan. 13, 2006), which is totally lacking here.

Finally, Sitting Bear has failed to establish that his ultimate sentence is unreasonable, i.e., that the district court abused its discretion in sentencing him to 228 months of imprisonment, or 40 months above the advisory Guidelines range (computed without considering any grounds for an upward departure). After considering Sitting Bear's minimal criminal history, background, and the specific facts of the case, the district court stated, "[t]his is such an aggravated case. It is one thing to cause the death of your child. But with this amount of torture that was going on I am, of course, going to take that into account in sentencing here." (May 9, 2005, Sent. Tr. at 79.) We conclude that the sentence is not unreasonable.

III.  Marshall's Sentence

The only challenge Marshall makes to her sentence is its reasonableness.  We review the sentence imposed by the district court for an abuse of discretion.  Long Soldier, 431 F.3d at 1123.  "A sentencing court abuses its discretion if its fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors."  Id.  Relevant factors for sentencing purposes are those factors identified in § 3553(a).

Marshall points to § 3553(a)(6), the need to avoid unwarranted sentencing disparity, and argues that she should have been sentenced based on her actual conduct, which was child abuse.  She believes that her 228-month sentence is extreme when compared to two cases where defendants convicted of abusing children received sentences of 51 and 63 months.  We dismiss this disparate sentencing argument by noting simply that those cases did not involve the six months of torture endured by John, Jr. at the hands of his own mother or result in the children's death.  Marshall pleaded guilty to aiding and abetting second degree murder, not to committing child abuse.  Whoever aids and abets the commission of another crime is punishable as a principal.  18 U.S.C. § 2.  This is not the type of disparity with which Congress was concerned.

The district court found that Marshall and Sitting Bear were equally culpable for the actions that led to and ultimately caused John, Jr.'s death.  It supported its sentence with findings that "up until the last day of [John, Jr.'s] life [Marshall] was responsible for more of this child abuse than was Mr. Sitting Bear."  (May 9, 2005, Sent. Tr. at 72.)  In addition, John, Jr. had at least seven impact injuries to his head and 26 separate impact injuries to his back, buttocks, and legs.  There was ample evidence of nearly daily abuse, mostly by Marshall.  The pathologist who performed

-10-

the autopsy could not determine whether John, Jr.'s death was caused by the June 18 blow to his head or a combination of blows, some of which were older. During the six months that John, Jr. was in his mother's and father's care, he lost 19 pounds. Numerous witnesses testified that Marshall withheld food from him because he messed his pants and she did not like cleaning up after him. The district court considered Marshall's childhood, history of prior abuse toward her children, and the testimony of various witnesses in setting Marshall's sentence 40 months above the advisory Guidelines range. The district court amply supported the sentence it imposed on Marshall, which we believe is more than reasonable.

We likewise reject Marshall's argument that the district court erroneously considered her criminal history in sentencing her outside of the Guidelines range because her history was included in the Criminal History category III that resulted in the 151- to 188-month advisory range. The district court relied in part on the abuse inflicted against John, Jr., as well as abuse inflicted against her other children, none of which was reflected in Marshall's criminal history. There was no improper double counting of Marshall's criminal history.

## III. Conclusion

The district court's judgments are affirmed.

_____